UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
ERNESTINA THERESA DAVIS,

                    Plaintiff,

        -against-

ANDREW M. SAUL,
Commissioner of Social Security,

                    Defendant.
---------------------------------------------------------------X

**OPINION AND ORDER**

19 Civ. 02974 (JCM)

     Plaintiff Ernestina Theresa Davis ("Plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g), challenging the decision of the Commissioner of Social Security ("the Commissioner"), which denied Plaintiff's application for disability insurance benefits, finding her not disabled within the meaning of the Social Security Act. (Docket No. 1).  Presently before the Court are: (1) Plaintiff's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, (Docket No. 15), and (2) the Commissioner's cross-motion for judgment on the pleadings, (Docket No. 17).  For the reasons set forth herein, Plaintiff's motion is granted, the Commissioner's motion is denied, and the case is remanded for further proceedings consistent with this opinion.

## I.  BACKGROUND

     Plaintiff was born in 1976. (R.[1] 84).  She filed an application for disability insurance benefits on June 10, 2015, alleging that she became disabled on June 30, 2014. (R. 84).  Plaintiff's application was initially denied on November 9, 2015, (R. 101-03), after which Plaintiff requested a hearing, (R. 107-08), which was held on April 16, 2018, (R. 52-83).  Administrative Law Judge ("ALJ") Anne Sharrard issued a decision on April 26, 2018, denying

---

[1] Refers to the certified administrative record of proceedings ("Record") related to Plaintiff's application for social security benefits, filed in this action on July 29, 2019. (Docket Nos. 14 and 14-1).

Plaintiff's claim. (R. 39-47).  Plaintiff requested review by the Appeals Council, which denied

the request on January 30, 2019, (R. 1-4), making the ALJ's decision ripe for review.

## A.  Medical Evidence

As summarized below, the administrative record reflects medical treatment Plaintiff

received from multiple sources.

## 1.  Siri Medical Associates/Catskill Physical Medicine

On August 16, 2012, Plaintiff went to Siri Medical Associates ("Siri") complaining of

lower back pain that she had been experiencing for six years. (R. 292).  Plaintiff characterized

the pain as sharp, continuous and radiating down her right leg causing numbness, and

exacerbated by long bouts of standing, sitting, walking, lifting and bending forward. (*Id.*).

Plaintiff went to physical therapy for seven months and experienced no relief, but reported that

extending her spine, using a weightlifting belt, and medication alleviated her pain. (*Id.*).  During

a physical examination, Plaintiff experienced tenderness on her left and right lumbar

paraspinals/facets, had full range of motion but experienced pain at the end ranges, exhibited a

positive Dural stretch test bilaterally, but had no areas of altered sensation and her muscular

strength was 5/5. (R. 293).  Plaintiff was diagnosed with lumbar facet arthropathy and back pain,

and prescribed Tramadol. (R. 293-94).  An August 17, 2012 MRI revealed that Plaintiff had an

L3-L4 diffuse disc bulge, L4-L5 and L5-S1 disc bulges with mild foraminal narrowing

bilaterally, and that the L5-S1 abuts the L5 nerve roots. (R. 13, 14, 295).

During a follow-up visit on August 23, 2012, Plaintiff reported no changes in her

symptoms from the August 16, 2012 visit, except she characterized their severity as an 8/10 as

opposed to 10/10, and explained that she stopped taking Motrin because it had not been helpful.

(*Id.*).  Plaintiff's lumbar spine range of motion was full, but she experienced pain during flexion

more so than extension, and had tenderness upon palpitation on both her left and right paraspinals/facets. (R. 296).  Plaintiff's sitting Dural stretch test was positive on her left side, and her sensory examination showed decreased sensation on her entire lower left limb. (*Id.*).  Plaintiff was diagnosed with "pain in limb" in addition to lumbosacral radiculopathy and back pain, and "[l]ikely" had left lumbar radiculopathy with sensory and motor deficits of the left leg. (*Id.*).  Plaintiff was instructed to continue taking Tramadol and using a lumbar corset. (R. 297).

On August 28, 2012, Plaintiff received a transforaminal epidural injection directed at the L4-L5 and L5-S1 regions without complications. (R. 298-99).  Plaintiff had another visit on September 13, 2012 where she complained of an initial increase in pain after the injection, but that she experienced "significant relief" shortly thereafter. (R. 301).  Plaintiff, however, still assessed her discomfort at 8/10 during the visit. (*Id.*).  Plaintiff's Dural stretch test was now negative bilaterally, her sensory test revealed normal light touch sensations bilaterally, and her muscular strength remained 5/5. (R. 302).  Plaintiff's flexion-based pain improved following the epidural injections, but her left lumbar radiculopathy and motor deficits of the left leg remained unchanged. (*Id.*).  Plaintiff was again instructed to continue taking Tramadol and using a lumbar corset. (R. 303).

On September 19, 2012, Plaintiff received a second epidural injection directed at the L4-L5 and L5-S1 regions without complications. (R. 304-05).  On October 17, 2012, Plaintiff appeared for another visit and to receive diagnostic branch blocks because she continued to experience lower back pain on extension. (R. 307).  During a physical examination, Plaintiff's Dural stretch test was again positive on the left extremities, sensation was decreased on the entire left lower limb with strength at 4/5, but strength was otherwise 5/5. (*Id.*).  Plaintiff received medial branch blocks to the bilateral L3, L4, and bilateral dorsal rami of the L5, which she

tolerated without complications, but did not result in any immediate improvement of her lower back pain. (R. 308). Because the medial branch block injections did not provide any relief, Plaintiff's doctors opined that her pain was not likely "facet-mediated," and she was prescribed Percocet. (R. 309).

Plaintiff appeared for another visit on December 4, 2012 complaining of left side radicular lower back pain. (R. 310). Despite receiving injections, Plaintiff reported persistent severe low back pain that she rated 8/10, and said that she had stopped taking Percocet because she was developing a tolerance and it provided no relief. (*Id.*). Plaintiff's range of motion was full, with more pain on extension than flexion, and she had 5/5 muscular strength. (R. 311). Plaintiff's Dural stretch test was positive on the left, and she had normal sensation bilaterally, with her Babinski "down-going bilaterally," and Clonus absent bilaterally. (*Id.*). Given the "reproduction of pain with flexion-based maneuvers" and lack of relief from the medial branch block, Plaintiff was diagnosed with "[l]ikely" lumbar discogenic pain. (*Id.*). Plaintiff was instructed to continue wearing a lumbar brace and to use a lumbar Thermacare heat wrap. (R. 312).

Plaintiff had another visit on January 30, 2013, where she continued to complain of left-sided radicular lower back pain, and also complained of right medial hand, left forearm, and hand numbness, as well as intermittent neck tightness. (R. 313). Plaintiff reported that she was taking Motrin and Tylenol, which provided temporary relief. (*Id.*). Plaintiff's Spurling sign (for radicular symptoms) was negative bilaterally, her range of motion was full, with pain at extension more so than with flexion, she had tenderness across the left and right paraspinals/facets, and her muscular strength was 5/5. (R. 314). Plaintiff's Dural stretch was positive on the left and she had decreased sensation on her right fifth digit, left first digit, and left

anterior thigh and lateral heel. (*Id.*).  Plaintiff's doctors still noted that she likely had lumbar discogenic pain, myofascial pain with an active trigger point of the right-upper trapezius, and possible cervical radiculopathy. (*Id.*).  Plaintiff was prescribed Flexeril, and physical therapy was ordered for her neck pain. (R. 315).

Plaintiff appeared for another visit on February 4, 2013 complaining of back pain and pain radiating from her neck down her arm to her little finger. (R. 316).  A physical examination revealed that Plaintiff's Spurling sign was negative bilaterally, she had full range of motion with pain at extension more so than at flexion, tenderness across her left and right lumbar paraspinals/facets, and her Dural stretch test was positive on the left. (*Id.*).  Plaintiff was assessed to have left lumbar radiculopathy with sensory and motor deficits of the left leg, and likely cervical myofascial pain with an active trigger point in the right upper trapezius. (R. 317). Plaintiff was instructed to undergo a physical therapy evaluation, to engage in TENS, therapeutic exercises, and ultrasound therapy. (*Id.*).  Plaintiff appeared for office visits on February 12, 14, and 26, 2013, and received nerve stimulation, ultrasound therapy, and engaged in therapeutic exercises, which she tolerated well. (R. 318-20).  During each visit, she complained of 8/10 pain in her lower back that radiated to the lower extremities and in her neck radiating down her arm to her right little finger. (R. 318-20).

On March 1, 2013, Plaintiff had another visit and complained of left-sided radicular lower back pain and right-sided radicular neck pain. (R. 321).  Plaintiff reported no changes to her symptoms despite four physical therapy sessions, and rated her neck pain as 6/10 and her back pain as 8/10. (*Id.*).  Plaintiff had full range of motion in her neck, with pain at the end range, and tenderness of the bilateral C-paraspinals/facets and upper trapezius muscles. (R. 322). Plaintiff's Spurling's sign was negative bilaterally, she had full range of motion of the L-spine

with pain on extension more so than flexion, and experienced tenderness across the left and right

lumbar paraspinals/facets. (*Id.*).  Plaintiff's Dural stretch test was positive on the left, and she

again presented with decreased sensation on her right fifth digit, left first digit, and left anterior

thigh and lateral heel, but her strength was 5/5. (*Id.*).  Plaintiff was assessed to have left lumbar

radiculopathy with sensory and motor deficits of the left leg, and likely have lumbar discogenic

pain, cervical myofascial pain, with possible right cervical radiculopathy. (R. 323).  Plaintiff was

instructed to continue taking Flexeril and doing physical therapy for her neck. (*Id.*).

Plaintiff had another visit a few days later on March 4, 2013 where she complained of

left-sided radicular lower back pain and right-sided radicular neck pain. (R. 324).  There was

little change from the March 1 to 4, 2013 visit in Plaintiff's physical examination, but cubital

tunnel syndrome was added to her diagnoses, which now included the following: (1) lumbosacral

radiculopathy; (2) back pain; (3) pain in limb; (4) neck pain; (5) cervical radiculopathy; and (6)

cubital tunnel syndrome. (R. 325).  On March 14, 2013, Plaintiff received nerve stimulation,

ultrasound therapy, and engaged in therapeutic exercises, which she tolerated well. (R. 327).

On March 18, 2013, Plaintiff had another visit where she complained of left-sided

radicular lower back pain and right medial hand pain and numbness. (R. 328).  There were few

changes from the March 1, 2013 visit, except that Plaintiff now characterized her back pain as a

7/10. (*Id.*).  A March 7, 2013 MRI of Plaintiff's cervical spine revealed: (1) there was shallow

central disc herniation and mild deforming of the ventral sac at C3-C4; (2) minimal disc bulge at

C4-C5; (3) mild degenerative disc disease with moderate disc bulge encroaching on the ventral

cord and causing mild bilateral foraminal narrowing at C5-C6; and (4) a mild disc bulge at C6-

C7. (R. 289-90, 329, 342-43).  A March 4, 2013 EMG study of Plaintiff's upper limbs revealed:

(1) evidence of demyelinating, non-localizable right ulnar neuropathy; and (2) decreased

6

amplitude of the right ulnar sensory nerve when compared with the contralateral side. (R. 329).

Plaintiff's diagnoses remained the same from the March 1, 2013 visit, except cubital tunnel

syndrome was omitted. (R. 330).  Plaintiff was prescribed a Medrol pack, and instructed to

continue taking Flexeril and going to physical therapy for her neck. (*Id.*).  On March 21, 2013,

Plaintiff received nerve stimulation, ultrasound therapy, and engaged in therapeutic exercises,

which Plaintiff tolerated well. (R. 331).

On October 18, 2013, Plaintiff had a follow-up visit where she complained of left-sided

radicular lower back pain. (R. 332).  Plaintiff rated her back pain as 10/10, and neck pain as 6/10,

and explained that she had been taking 250 mg of Tylenol, but it was not alleviating her pain.

(*Id.*).  Plaintiff reported having been evaluated by Dr. Weiss, a spine surgeon at Mount Sinai

Hospital, but did not feel comfortable having surgery. (*Id.*).  Plaintiff's physical examination

remained largely the same as her previous March 2013 visits, and her diagnoses and assessments

similarly remained unchanged. (R. 333-34).  Plaintiff was instructed to continue taking

Methocarbamol PRN and going to physical therapy for her neck. (R. 334).

**2.  Muhammad Sanni Adam, M.D.**

On March 9, 2015, Dr. Muhammad Sanni Adam saw Plaintiff for a wellness visit. (R.

374).  Plaintiff presented with chronic scoliosis, vertigo, and asthma. (*Id.*).  After a routine

medical examination, Dr. Adam prescribed Plaintiff with: (1) 800 mg of Ibuprofen three times

per day for 30 days for her scoliosis; (2) Meclizine for her vertigo; and (3) albuterol sulfate for

her asthma. (R. 375).  Plaintiff saw Dr. Adam on June 24, 2015 for a medication refill, during

which he also counseled her on the importance of diet and exercise. (R. 372-73).  Plaintiff saw

Dr. Adam again on September 14, 2015 to refill her asthma medication. (R. 370-71).

On November 27, 2015, Dr. Adam completed a "Care Required for Sick/Disabled Household Member" form for the New York City Human Resources Administration ("NYCHRA"). (R. 356).  Dr. Adam wrote that Plaintiff was diagnosed with asthma and scoliosis, that she had been disabled since August of 2006, and that her disability was likely to last for more than seven months. (*Id.*).  Dr. Adam indicated that Plaintiff required home care services or a home attendant, and that Wilfredo Camacho, Plaintiff's partner, presently provided such services. (*Id.*).  Dr. Adam noted that Plaintiff would require assistance: (1) ambulating inside and outside the house; (2) getting up from bed and a seated position; (4) washing herself; and (5) preparing meals. (*Id.*).  Dr. Adam further concluded that Plaintiff would not require assistance: (1) getting up from a seated position;[2] (2) using the bathroom; or (3) dressing, bathing, and feeding herself. (*Id.*).

On September 16, 2016, Plaintiff saw Dr. Adam for a referral to a dermatologist and to refill her asthma medication. (R. 368).  Dr. Adam also conducted a general examination, and noted that Plaintiff's extremities presented with no clubbing, cyanosis, edema, or pulses, she was alert and oriented, and did not have any apparent rash or skin lesions. (*Id.*).  On July 17, 2017, Plaintiff saw Dr. Adam again for a medication refill and a general visit. (R. 365-67).  Dr. Adam diagnosed Plaintiff with, *inter alia*, lower back pain. (R. 366).  The medical records indicated that Plaintiff's skin was free of rashes or lesions at the visit, her extremities presented with no clubbing, edema, cyanosis, or pulses, she had no swelling or deformities on her musculoskeletal system, and she was alert and oriented. (R. 366).  Dr. Adam refilled Plaintiff's Ventolin aerosol solution, her Albuterol Sulfate solution, and also referred Plaintiff for pain management at Montefiore Medical Center. (R. 367).

---

[2] Dr. Adam checked that she could perform this action both with and without assistance. (R. 356).

On December 11, 2017, Plaintiff saw Dr. Adam for a referral to a dermatologist and to complete a form. (R. 362). During the general examination, Plaintiff's skin was free of rashes or lesions, her extremities presented with no clubbing, edema, cyanosis, or pulses, she had no swelling or deformities on her musculoskeletal system and was alert and oriented. (*Id.*). Dr. Adam prescribed Plaintiff Cephalexin and referred her to a dermatologist to "evaluate and treat" her hidradenitis. (R. 363).

When Plaintiff was 41 years old,[3] Dr. Adam completed a second "Care Required for Sick/Disabled Household Member" form for NYCHRA. (R. 392). Dr. Adam listed Plaintiff's diagnoses as asthma, scoliosis, vertigo, hidradenitis suppurativa, and stated that Plaintiff had been disabled since August of 2006. (*Id.*). Dr. Adam noted that Plaintiff required home care, which her partner, Wilfredo Camacho, was presently providing. (*Id.*). Dr. Adam indicated that Plaintiff would require assistance: (1) ambulating inside and outside the house; (2) getting up from bed and a seated position; (3) washing herself and using the toilet; and (4) preparing meals. (*Id.*). Dr. Adam opined that Plaintiff would be able, without assistance, to: (1) get up from a seated position; (2) use the toilet; (3) dress herself; (4) bathe herself; and (5) feed herself. (*Id.*).[4] Dr. Adam also concluded that Plaintiff could not be left alone. (*Id.*).

**3. Marie Bien-Aime, ANP**

On September 18, 2015, Plaintiff saw Adult Nurse Practitioner ("ANP") Marie Bien-Aime for an initial consultation evaluation for pain management. (R. 336-40). Plaintiff was referred to ANP Bien-Aime by Dr. Adam due to chronic neck and lower-back pain that radiated to her upper and lower extremities. (R. 336). Plaintiff's pain had been controlled by medication

---

[3] This form is not dated, but it lists Plaintiff's age as 41. (R. 392).

[4] Dr. Adam noted that Plaintiff could get up from a seated position and use the toilet both with and without assistance. (R. 392).

and physical therapy up until three weeks prior to the consultation, when she began experiencing numbness, burning and tingling. (*Id.*).  Plaintiff rated her pain as 4/10 with medication, but 8/10 without medication. (*Id.*).  During a general examination, Plaintiff expressed having joint pain and muscle aches, but did not have any vertigo, dizziness, rashes, lumps or lesions. (R. 337). Plaintiff appeared awake, alert, and oriented, and was able to walk without any aids, but had an antalgic gait. (*Id.*).  Plaintiff's coordination was largely good, as her FTN, HTS, RAM, and tandem gait were intact, and her Romberg test was negative. (R. 337-38).

Plaintiff's Spurling test, however, was positive bilaterally, she had tenderness over the paravertebral area, and experienced pain when flexing and extending her trapezius and rhomboid, and when rotating right and left. (R. 338).  Plaintiff's Patrick test and straight leg test were both positive, and she exhibited facet loading to the right and left. (*Id.*).  Plaintiff's range of motion in her upper extremities was limited, but normal on her wrist, elbow and shoulder, and her strength was 5/5. (*Id.*).  Plaintiff's range of motion in her lower extremities bilaterally was limited, but normal in her toes, ankle, knees and hips bilaterally, and her strength overall was +4/5. (*Id.*).  Plaintiff's light touch and pinprick were intact on both her upper and lower extremities, her reflexes on her ankle and knee were normal, and she had a negative Babinski test bilaterally. (*Id.*).

ANP Bien-Aime diagnosed Plaintiff with lumbosacral spondylosis, lumbar disc displacement, lumbosacral neuritis, chronic pain syndrome, cervicalgia, cervical radiculitis, as well as asthma and scoliosis and recommended that Plaintiff continue physical therapy and avoid heavy lifting. (R. 338-39).  She prescribed Plaintiff with Mobic, Baclofen and Neurotin, and discussed a pain treatment plan to promote healing, relieve Plaintiff's muscle spasms and pain,

reduce inflammation and edema, and improve Plaintiff's physical capacities and mobility. (R. 339-40).

### 4. Other Medical Evidence

On September 30, 2015, Plaintiff had an MRI of her lumbosacral spine. (R. 341). The MRI demonstrated that Plaintiff's vertebrate body marrow signal was within normal limits, and there was no vertebral body compression. (*Id.*). Plaintiff's L4-L5 and L5-S1 demonstrated a disc bulge and facet/ligamentous hypertrophy with mild bilateral foraminal stenosis, and the overall impression was that Plaintiff had: (1) lower lumbar disc bulges without significant interval change, central stenosis, or nerve root impingement; and (2) mild scoliosis. (*Id.*). On that same date, an MRI of Plaintiff's cervical spine demonstrated that: (1) the C3-C4, C5-C6, and C6-C7 had a disc bulge/osteophyte complex and facet/uncinate hypertrophy with mild central canal stenosis, and (2) the C3-C4 and C5-C6 also showed mild bilateral foraminal stenosis. (R. 346).

On November 27, 2015, Plaintiff saw Dr. Audrey M. Weissman, an allergist, who conducted allergy and skin testing that demonstrated "no positive allergy reaction." (R. 393). Plaintiff also underwent a pulmonary function analysis, which revealed that: (1) spirometry and diffusion capacity were both within normal limits; and (2) Plaintiff had an "insignificant response to bronchodilator." (R. 394-96).

### 5. Sharon Revan, M.D. – Consultative Examination

Plaintiff saw Dr. Sharon Revan for a consultative internal medical examination on October 30, 2015. (R. 349). Plaintiff's chief complaints were her history of asthma, scoliosis, vertigo and hidradenitis. (*Id.*). Plaintiff reported having asthma since 1992, which caused her to go to the emergency room in 2012, but never caused her to be intubated. (*Id.*). Plaintiff's hidradenitis began in 2006, and affected her armpits, thighs, and rectal area, and was not

controlled well by medication. (*Id.*).  Plaintiff explained that for the past six to eight months, she

had sporadic vertigo that did not cause any nausea or vomiting. (*Id.*).  Plaintiff reported having

scoliosis since 2007, and indicated that it caused a throbbing and a sharp 10/10 pain that had not

improved with physical therapy or by using a back brace, and worsened with long periods of

standing, walking and stair-climbing. (*Id.*).  Plaintiff explained that her pain was "better with

Motrin and [a] hot shower." (*Id.*).  Plaintiff indicated that she showers and dresses herself, but

does not cook, clean, do laundry, or shop due to back pain and dizziness. (R. 350).  Plaintiff's

medications included: Baclofen, Meclizine, Gabapentin, Meloxicam, Ventolin, Cephalexin and

Ibuprofen. (R. 349-50).

Plaintiff did not appear to be in any acute distress, had a normal gait, was able to walk on

her heels and toes without difficulty and to squat halfway "holding on," did not use any assistive

devices, was able to rise from a chair without difficulty, and did not need any assistance

changing or getting on and off the examination table. (R. 350).  Plaintiff's cervical spine had

scoliosis on the right, but showed full flexion, extension, lateral flexion bilaterally, and full

rotary movement. (R. 351).  Plaintiff's lumbar spine flexion was 45 degrees, and she had full

lateral flexion and rotation. (*Id.*).  Plaintiff's straight leg raise test was positive at 30 degrees

bilaterally, and she had lower back pain in response to palpitation. (*Id.*).  Plaintiff had full range

of motion in her shoulders, elbows, forearms, wrists, knees and ankles bilaterally, as well as full

range of motion in her hips, albeit with pain. (*Id.*).  Plaintiff's joints were stable and not tender,

and she had no obvious subluxations, contractures, ankylosis or thickening. (*Id.*).  Plaintiff's

strength was 5/5 in both her upper and lower extremities, and she did not have any cyanosis,

clubbing, edema or apparent muscular atrophy. (*Id.*).  Plaintiff's hand and finger dexterity was

intact, and her grip strength was 5/5 bilaterally. (*Id.*).  Dr. Revan also reviewed a November 2, 2015 X-ray of Plaintiff's L-spine which revealed mild scoliosis. (R. 351, 353).

Dr. Revan diagnosed Plaintiff with asthma, scoliosis, vertigo, and hidradenitis, and provided the following medical source statement:

> In my opinion, the [Plaintiff] has no limitation with her speech, vision, or hearing. There is no limitation with the upper extremities for fine and gross motor activity. Mild limitations with walking, standing, and climbing stairs, and sitting due to back pain.  Mild limitations with personal grooming and activities of daily living secondary to her back pain.

(R. 352).

## B.  Plaintiff's Testimony

David E. Levine represented Plaintiff at the April 16, 2018 hearing. (R. 52).  Plaintiff testified that she lived with her partner, and three children, ages twelve, eleven, and three. (R. 58).  Plaintiff did not work from 2003 through 2011, but worked as a hair stylist out of her home from 2012 to 2014, and also babysat in 2012. (R. 60-61).  Plaintiff taught herself how to style and braid hair, but did not cut or dye hair. (R. 61).  Plaintiff testified that she worked out of her home because she would "constantly…start and stop," and was not able to stand for long periods of time. (*Id.*).

Plaintiff testified that she stopped working as a hair stylist because "it was taking a toll on [her] back, and [her] hands started to lock up." (R. 61, 63).  Plaintiff explained that her back pain radiated down to her legs and occasionally her feet, and made it hard for her to style hair even while seated. (R. 63-64).  Plaintiff testified that her asthma and vertigo inhibit her ability to work, along with pain experienced in the morning, for which Plaintiff took Motrin "just to get out of…bed." (R. 64).  Plaintiff testified that her partner takes the children to school, does the

laundry, cooking and shopping, and that she is able to teach her three-year old, change his diaper, and "wash a plate or two, [but] not too much." (R. 65).

Plaintiff testified that her vertigo "started…out of nowhere," and that she gets dizzy when she "throw[s] [her] head back too far" and "bend[s] down too fast." (R. 66). Plaintiff takes Meclizine for her vertigo, but does not like to take it when she is home alone with her child because she is afraid it will cause her to pass out. (R. 66-67). Plaintiff also testified that her asthma caused her to go to the hospital in 2011 or 2012, and that she uses an albuterol inhaler. (R. 67-68). Plaintiff explained that she received treatment for her back issues, the most recent of which occurred "a few months" prior to the April 16, 2018 hearing. (R. 68). Plaintiff had been receiving back injections since 2011, at first twice a month, and then only once a month, but testified that they did not work. (R. 69). Plaintiff testified that she went to physical therapy for her back because she did not want to continue with the frequent injections, but that it also did not help. (*Id.*). Plaintiff explained that she had a sharp pain that would sometimes "shoot all the way from the bottom of [her] back up to [her] head," and at other times "shoot from [her] lower back down to [her] feet." [5] (R. 70). Plaintiff was not presently having any issues with her hands or fingers, but prior issues included aching, cramping and a locking sensation. (R. 70-71). Plaintiff also testified that she has a skin condition that causes blisters, and flares up "all the time," for which she was prescribed an "alcohol cleanser." (R. 76).

Plaintiff further testified that she could probably only sit for an hour in an eight-hour shift, and that she could only stand for thirty minutes at a time. (R. 71-72). Plaintiff testified that she had to lie down during the day and spends "maybe half of the day" lying down. (R. 73). Plaintiff also explained that her back pain radiates to her fingertips and toes and causes them to

---

[5] Plaintiff was wearing a back brace during the hearing. (R. 73).

go numb. (R. 74).  In addition to Motrin and Meclizine, Plaintiff explained that she also takes a

muscle relaxant. (R. 74-75).

## C.  The Vocational Expert's Testimony

Vocational Expert ("VE") Theresa Kopitzke testified that she heard Plaintiff's testimony

and reviewed the relevant vocational exhibits. (R. 78).  The VE explained that Plaintiff's past

relevant work of a hair stylist constituted "light" work pursuant to the DOT guidelines. (R. 79).

The ALJ posed a hypothetical to the VE, asking her to assume an individual of Plaintiff's age,

education and work experience, who had the following RFC: the individual could (1)

occasionally lift and carry 20 pounds and frequently carry 10 pounds; (2) sit, stand or walk six

hours per day; (3) never climb ladders, ropes or scaffolds; (4) occasionally climb ramps and

stairs, stoop, crouch, kneel, crawl, balance and push or pull with the lower extremities; and (5)

frequently be exposed to pulmonary irritants such as dust, fumes, gasses, noxious odors, poorly

ventilated areas, as well as humidity, extreme cold and extreme heat. (R. 79).  The VE

determined that such an individual could perform Plaintiff's past relevant work both as outlined

in the DOT guidelines and as actually performed by Plaintiff. (R. 79-80).  The ALJ next asked

the VE to assume the same hypothetical individual, except that the individual was limited to

occasionally lifting and carrying 10 pounds, frequently carried small docket files, and was

capable of standing and/or walking for two hours. (R. 80).  The VE determined that while such

an individual could not perform Plaintiff's past relevant work, the individual could perform jobs

that exist in the national economy, including: (1) document preparer; (2) telephone information

clerk; and (3) ticket checker, all of which are sedentary jobs. (*Id.*).  The ALJ asked the VE to

assume the same hypothetical individual, except that she could frequently reach with the bilateral

upper extremities. (*Id.*).  The VE determined that such an individual could work as a document

preparer, information clerk and hair stylist, but not as a ticket checker because it required

constant reaching. (R. 80-81).  The VE testified that if any of the hypothetical individuals were

off task 15 percent of the time, there would be no jobs in the national economy that they could

perform, and that typically a person can be off task no more than 10 percent before being

terminated. (R. 81-82).

**D.  The ALJ's Decision**

In her April 26, 2018 decision, ALJ Sharrard applied the five-step procedure established

by the Commissioner for evaluating disability claims. *See* 20 C.F.R. § 416.920(a).  At step one,

the ALJ found that Plaintiff did not engage in substantial gainful activity during the relevant

period. (R. 41).  At step two, the ALJ found that Plaintiff had the following severe impairments:

mild scoliosis, lower lumbar disc bulges without central canal stenosis or nerve root

impingement, disc osteophyte complexes at the C3-C4, C5-C6, and C6-C7 disc levels with mild

stenosis at the C5-C6 disc level, chronic pain syndrome, and vertigo. (R. 41-42).  At step three,

the ALJ determined that Plaintiff did not have an impairment or combination of impairments that

met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1. (R. 44).

The ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform

light work as defined in 20 C.F.R. 416.967(b), with the following limitations: Plaintiff can: (1)

occasionally lift or carry 20 pounds and frequently carry 10 pounds; (2) stand or walk for six of

eight hours during the workday, and sit for six of eight hours during the workday; (3) she cannot

climb ladders, ropes or scaffolds; (4) she can occasionally climb ramps and stairs, stop, crouch,

kneel, crawl, balance and push or pull with the lower extremities; (5) she can frequently reach

bilaterally with her upper extremities; (6) she can frequently be exposed to pulmonary irritants

such as dust, fumes, gasses, poorly ventilated areas, and to humidity, extreme cold, and extreme heat. (R. 43).

In arriving at the RFC, the ALJ first determined that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (R. 44). In assessing the medical opinions, the ALJ assigned "great weight" to Dr. Revan's consultative opinion, but assigned "little weight" to Dr. Adam's[6] opinion. (R. 45). At step four, the ALJ found that Plaintiff was able to perform her past relevant work as a hair stylist, and alternatively concluded at step five that other jobs existed in the national economy that Plaintiff could perform. (R. 45-46). The ALJ concluded that based on Plaintiff's age, education, work experience, and RFC, she can engage in work that exists in significant numbers in the national economy and was not disabled during the relevant period. (R. 47).

## II. DISCUSSION

Plaintiff contends that the ALJ's decision was not supported by substantial evidence. Specifically, Plaintiff argues that the ALJ: (1) improperly applied the treating physician rule; and (2) erred by neglecting to consider the side effects of Plaintiff's medications. (Docket No. 16). The Commissioner argues that the ALJ's decision should be affirmed because it was supported by substantial evidence and based upon correct legal standards. (Docket No. 18).

## A. Legal Standards

A claimant is disabled if he "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

---

[6] The ALJ refers to Dr. Adam as Dr. "Azam." (R. 45).

than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C.

§ 423(d)(1)(A)).  The Social Security Administration ("SSA") has enacted a five-step sequential

analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful
> activity; (2) whether the claimant has a severe impairment or
> combination of impairments; (3) whether the impairment meets or
> equals the severity of the specified impairments in the Listing of
> Impairments; (4) based on a "residual functional capacity"
> assessment, whether the claimant can perform any of his or her
> past relevant work despite the impairment; and (5) whether there
> are significant numbers of jobs in the national economy that the
> claimant can perform given the claimant's residual functional
> capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117,

120 (2d Cir. 2008); 20 C.F.R. § 416.920(a)(4)(i)-(v).

The claimant has the general burden of proving that he or she is statutorily disabled "and

bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176

(quoting *Burgess*, 537 F.3d at 128).  At step five, the burden then shifts "to the Commissioner to

show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*,

683 F.3d 443, 445 (2d Cir. 2012).

**B.  Standard of Review**

When reviewing an appeal from a denial of disability insurance benefits, the Court's

review is "limited to determining whether the SSA's conclusions were supported by substantial

evidence in the record and were based on a correct legal standard." *Selian v. Astrue,* 708 F.3d

409, 417 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also*

42 U.S.C. § 405(g).  The Court does not substitute its judgment for the agency's, "or determine

*de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.,* 692 F.3d 118, 122 (2d

Cir. 2012) (alteration in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)).

However, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  Therefore, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id.*  "Where there are gaps in the administrative record or the ALJ has applied an improper legal standard," remand to the Commissioner "for further development of the evidence" is appropriate. *Rosa v. Callahan,* 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

**C.  The ALJ's Evaluation of the Treating Physician Evidence**

"Social Security Administration regulations, as well as [Second Circuit] precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). "First, the ALJ must decide whether the opinion is entitled to controlling weight." *Id.*  The ALJ must afford controlling weight to a treating physician's opinion as to the nature and severity of the impairment if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* (citing *Burgess*, 537 F.3d at 128).  If there is substantial evidence in the record that contradicts or questions the credibility of a treating source's assessment, the ALJ may give that treating source's opinion less deference. *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (finding that treating physician's opinions were not entitled to controlling weight because they were not supported by substantial evidence in the record).

Second, if the ALJ does not give controlling weight to a treating source's opinion, the ALJ must consider various factors and provide "good reasons" for the weight given. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).  These "nonexclusive '*Burgess* factors' [include]: '(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.'" *Estrella*, 925 F.3d at 95-96 (citing *Selian*, 708 F.3d at 418).  "[T]o override the opinion of the treating physician . . . the ALJ must explicitly consider" the foregoing factors. *Greek*, 802 F.3d at 375 (alteration in original) (quoting *Selian*, 708 F.3d at 418).  "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96.  If the ALJ does not "explicitly" consider these factors, the case must be remanded unless "a searching review of the record" assures the Court that the ALJ applied "the substance of the treating physician rule." *Id.*

Plaintiff argues that the ALJ erred by assigning "little weight" to Dr. Adam's opinion because she: (1) failed to consider its consistency with the record evidence; and (2) failed to consider a November 27, 2015 assessment completed by Dr. Adam. (Docket No. 16 at 15-18). The Commissioner argues that the ALJ properly discounted Dr. Adam's opinion because it was not consistent with the other record evidence, specifically Dr. Revan's examination-based findings. (Docket No. 18 at 27-28).  The Commissioner also argues that the ALJ's failure to consider the November 27, 2015 assessment constituted harmless error because the assessment contained "largely similar" findings as Dr. Adam's later assessment, which the ALJ considered. (Docket No. 18 at 29).  The ALJ assigned "little weight" to Dr. Adam's opinion, first summarizing his opinion as follows: "Dr. Mohammad Azam [sic] M.D. found that the [Plaintiff]

was disabled since 2006, qualifies for long-term disability, and needs assistance with getting up from a seated position, ambulating, getting up from bed, washing, and preparing meals." (R. 45). The ALJ "grant[ed] this opinion little weight since it is vague and not a full assessment of the [Plaintiff's] abilities" and because "[it] is not supported, as testing by Dr. Revan showed full strength, a normal gait, a positive straight leg raise test, and tenderness to palpitation." (*Id.*).

Upon careful review of the record, the Court concludes that the ALJ failed to explicitly consider each of the *Burgess* factors in evaluating Dr. Adam's opinion, thus committing procedural error. *See Estrella*, 925 F.3d at 96.  The Court, therefore, must conduct a "searching review of the record" to determine whether the ALJ applied the substance of the treating physician rule. *Id.*  The Court must also be satisfied that the record demonstrates that the ALJ weighed Dr. Adam's opinion to determine "how closely [it] align[ed] with the objective medical record evidence." *Cardoza v. Comm'r of Soc. Sec.*, 353 F. Supp. 3d 267, 283 (S.D.N.Y. 2019). After conducting a "searching review of the record," the Court is not satisfied that the ALJ properly weighed Dr. Adam's opinion, and thus failed to apply the substance of the treating physician rule.

In determining the appropriate weight to assign Dr. Adam's opinion, the ALJ first concluded that it was "vague" and did not provide a "full assessment of [Plaintiff's] abilities." (R. 45).  However, "the ALJ has the duty to recontact a treating physician for clarification if the treating physician's opinion is unclear." *Stokes v. Comm'r of Soc. Sec.*, No. 10-CV-0278 (JFB), 2012 WL 1067660, at *11 (E.D.N.Y. Mar. 29, 2012) (quoting *Ellet v. Comm'r of Soc. Sec.*, No. 1:06-CV-1079 (FJS), 2011 WL 1204921, at *7 (N.D.N.Y. Mar. 29, 2011)).  While the single-page assessment completed by Dr. Adam may have been vague, (R. 392), the proper solution was not to reject the opinions contained therein due to vagueness and incompleteness, but rather

to recontact Dr. Adam in an effort to have him clarify any ambiguities.  Dr. Adam treated

Plaintiff prior to and throughout the relevant period, (R. 358-76), referred Plaintiff to pain

management specialists, (R. 336-40, 392-95), and thus should have been afforded the

opportunity to clarify his opinion if the ALJ found it vague and incomplete.  This is especially

true here considering that the ALJ rejected Dr. Adam's opinion because it was not based on a

"full assessment of the [Plaintiff's] abilities," (R. 45), in contrast to Dr. Revan's consultative

opinion, which was generated after a single examination. *See Isernia v. Colvin*, No. 14-CV-2528

(JEB), 2015 WL 5567113, at *10 (E.D.N.Y. Sept. 22, 2015) (remanding where the ALJ

characterized the treating physician's opinion as vague, and "specifically stated [that] he wished

[the physician] had provided: a function-by-function assessment of plaintiff's various mental

limitations.").  Thus, the ALJ's rejection of Dr. Adam's opinion based on vagueness and

incompleteness, and her subsequent failure to clarify or fill this void, constitutes an error

warranting remand. *See, e.g.*, *Ruiz v. Comm'r of Soc. Sec.*, 1:18-cv-09659 (SDA), 2020 WL

728814, at *11 (S.D.N.Y. Feb. 13, 2020) (remanding to further develop the record where the

ALJ found the treating physician's opinion vague) (collecting cases); *Heidrich v. Berryhill*, 312

F. Supp. 3d 371, 374 (W.D.N.Y. 2018) (remanding and directing the ALJ to recontact the

treating physician where the treating physician's opinion was ambiguous); *Isernia*, 2015 WL

5567113, at *10 (remanding where the treating physician's opinion was vague and unclear)

(collecting cases); *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 504 (S.D.N.Y. 2014) (An

ALJ must "seek additional evidence or clarification from [the] medical source when [a] report

from [the] medical source contains a conflict or ambiguity that must be resolved") (citation and

internal quotation marks omitted); *Stokes*, 2012 WL 1067660, at *12 (directing ALJ on remand

to recontact the treating physician where the ALJ found the opinion unclear).

The ALJ also did not provide "good reasons" for discounting Dr. Adam's opinion. *Aung Winn v. Colvin*, 541 F. App'x 67, 70 (2d Cir. 2013). "The Second Circuit 'has consistently held that the failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand.'" *Laracuente v. Colvin*, 212 F. Supp. 3d 451, 466 (S.D.N.Y. 2016) (quoting *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012)). The ALJ asserted that Dr. Adam's opinion "[was] not supported," but did not cite to any record evidence in support of this conclusion; instead, he simply contrasted it with some of Dr. Revan's examination findings. (R. 45). For example, the ALJ did not evaluate whether Dr. Adam's opinion was consistent with (1) ANP Bien-Aime's pain management evaluation, (R. 336-40); (2) any of the MRI and imaging done, (R. 342-47); or (3) the records from Plaintiff's treatment at Siri Medical Associates,[7] (R. 292-335). While the ALJ "remains free to discount the views of a treating physician if it is inconsistent with substantial evidence…it is reversible error for an ALJ to omit reasons for dismissing the views of a treating physician." *Price v. Comm'r of Soc. Sec.*, 14-CV-9164 (JPO), 2016 WL 1271501, at *4 (S.D.N.Y. Mar. 31, 2016) (internal citations and quotations omitted). Thus, the ALJ's failure to discuss the record evidence supporting his treatment of Dr. Adam's opinion constitutes an error that warrants remand. *See Aung*, 541 F. App'x at 70 ("[F]ailure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand.") (citation and internal quotation marks omitted); *Greek*, 802 F.3d at 376 ("Because the ALJ rested his rejection of [the treating physician's] opinion on flawed reasoning and failed to provide any other reasons for rejecting the opinion, the ALJ erred").

---

[7] Although these records predate the alleged onset date, they still may be relevant, and should have been considered. *See Petrie v. Astrue*, No. 08-CV-1289 (GLS/VEB), 2009 WL 6084277, at *7 (N.D.N.Y. Nov. 10, 2009) (finding that the ALJ did not have to give controlling weight to evidence that predated the alleged onset date, but that such assessments "may have some relevance."), *report and recommendation adopted*, 2010 WL 1063836 (N.D.N.Y. Mar. 19, 2010), *aff'd*, 412 F. App'x 401 (2d Cir. 2011).

Additionally, the ALJ's inconsistent use of Dr. Revan's opinion when assessing Dr. Adam's opinion constitutes an error warranting remand.  The ALJ rejected Dr. Adam's opinion in large part because it was "not supported, as testing by Dr. Revan showed full strength, a normal gait, a positive straight leg raise test, and tenderness to palpitation." (R. 45).  Although the first two findings support the ALJ's decision, the second two findings – a positive straight leg test and tenderness to palpitation – do not.  However, the ALJ provided no reasons for discounting Dr. Revan's opinion. "[W]hen the ALJ uses a portion of a given opinion to support a finding, while rejecting another portion of that opinion, the ALJ must have a sound reason for the discrepancy." *Annabi v. Berryhill*, No. 16-CV-9057 (BCM), 2018 WL 1609271, at *18 (S.D.N.Y. Mar. 30, 2018) (quotations and citation omitted).  The decision is silent with respect to why he cited these four findings from Dr. Revan's report, and neglected to cite others that either supported – or rebutted – Dr. Adam's report. (R. 45).  The Court, thus, is unable to determine whether the ALJ's inconsistent use of these opinions represents a "misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both." *Artinian v. Berryhill*, 16-cv-4404 (ADS), 2018 WL 401186, at *8 (E.D.N.Y. Jan. 12, 2018) (citations and quotations omitted).

Finally, the Commissioner also argues that the ALJ's failure to consider Dr. Adam's November 27, 2015 form constituted harmless error. (Docket No. 18 at 29).  However, as discussed in this section, the ALJ's treatment of Dr. Adam's opinion, on the whole, does not constitute harmless error.  "An error in application of the treating physician rule is harmless if 'application of the correct legal standard could lead to only one conclusion.'" *Price*, 2016 WL 1271501, at *4 (quoting *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010)).  Because the ALJ's determination is based largely on her characterization of Dr. Adam's opinion as "vague" and

incomplete, (R. 45), the Court cannot conclude that a correct application of the treating physician

rule, which would include weighing Dr. Adam's opinions in light of all record evidence –

including the November 27, 2015 form – would lead to only one conclusion. *See Ruiz*, 2020 WL

728814, at *12 ("Because [the treating physician's] opinions as to [Plaintiff's] ability to lift,

carry, push, pull and use her hands are vague, the Court cannot speculate as to whether the ALJ's

failure to comply with the requirements of the treating physician rule is harmless.").

Thus, because an "ALJ may not dismiss the views of any alleged treatment physician *sub

silentio*, without inquiry into the basis of those views and an explanation for the decision on the

record," *Price*, 2016 WL 1271501, at * 5, remand is appropriate to correct this error.  On

remand, the ALJ "should give sufficient explanation for the weight assigned to [Dr. Adam's]"

opinion, and "[t]hese reasons must be more than conclusory statements and generic references to

the record as a whole." *Laracuente*, 212 F. Supp. 3d at 467 (internal citations omitted).

## D.  The Appeals Council's Consideration of Additional Evidence

Plaintiff argues that the Appeals Council erred in not considering additional evidence that

supported Dr. Adam's assessment of Plaintiff. (Docket No. 16 at 17-18 n.28).  While this

argument is linked to Plaintiff's claim that the ALJ violated the treating physician rule, the Court

will assess it separately given the Appeals Council's decision not to consider the evidence.

In the Second Circuit, courts "have consistently held that the Commissioner should

consider new, material evidence that sheds light on the claimant's condition prior to the ALJ

determination—even if the evidence post-dates that determination." *Santiago-Jimenez v. Comm'r

of Soc. Sec.*, No. 15-CIV-3884 (GBD)(JCF), 2016 WL 5942318, at *3 (S.D.N.Y. Oct. 13, 2016)

(applying 20 C.F.R. § 416.1470(b) and 20 C.F.R. § 404.970) (citing *Pollard*, 377 F.3d at 193-

94).  "New" may be understood as "not merely cumulative of what is already in the record,"

while "material" has been defined as "both relevant to the claimant's condition during the time period for which benefits were denied and probative." *Santiago-Jimenez*, 2016 WL 5942318, at *3 (citing *Lisa v. Sec'y of Dep't of Health & Human Servs. of U.S.*, 940 F.2d 40, 43 (2d Cir. 1991)).  In addition, "[t]he concept of materiality requires . . . a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." *Id.* (citing *Pollard*, 377 F.3d at 193).  "When the new evidence submitted to the Appeals Council includes the opinion of a treating physician, however, the Appeals Council must give the same degree of deference to this opinion that an ALJ would be required to give." *Garcia v. Comm'r of Soc. Sec.*, 208 F. Supp. 3d 547, 552 (S.D.N.Y. 2016).  "Where the Appeals Council fails to appropriately consider new and material evidence in light of the treating physician rule, the proper course for the reviewing court is to remand the case for reconsideration in light of the new evidence." *Id.* (quotations and citations omitted).

The records at issue cover four visits that Plaintiff had with Dr. Fenar Themistocle at Interborough Interventional Pain Management in 2015 and 2016. [8] (R. 15-30).  These records consistently indicate that Plaintiff had pain in her lumbar spine on both flexion and extension, a positive Spurling sign and Patrick test on her left and right side, a positive straight leg raise, and an antalgic gait. (R. 16, 19, 26, 29).  These records also demonstrate that Plaintiff's functioning, including her ability to walk and stand at times, were painful and limited, and she reported "excruciating" lower back pain that radiated down to her lower extremities. (R. 15, 18, 25, 28).

In rejecting this additional evidence, the Appeals Council concluded that it "did not show a reasonable probability that it would change the outcome of the decision." (R. 2).  Given that

---

[8] The visits occurred on the following dates: November 2, 2015, (R. 15); December 6, 2015, (R. 18); February 9, 2016, (R. 21, 25); and August 30, 2016, (R. 28).

Dr. Themistocle qualifies as a treating source,[9] this "boilerplate language does not satisfy the Appeals Council's obligation to follow the treating physician rule." *Lugo v. Berryhill*, 18-cv-2179 (JGK)(RWL), 2019 WL 4418649, at \*16 (S.D.N.Y. May 8, 2019), *report and recommendation adopted*, 390 F. Supp. 3d 453 (S.D.N.Y. 2019).  This threadbare statement lacks any reasoning that sheds light on "why the Appeals Council found the proffered evidence immaterial," and thus "deprives the Court of its ability to determine whether the Commissioner's decision is supported by substantial evidence." *Nicholson v. Colvin*, No. 5:13-cv-00027 (MAD), 2014 WL 991827, at \*4 (N.D.N.Y. Mar. 13, 2014).

Further, there is a reasonable possibility that Dr. Themistocle's records would have caused the ALJ to reassess her decision and treatment of Dr. Adam's opinion.  The ALJ assigned the consultative examiner's opinion "great weight" in large part because it was "supported by her own testing," (R. 45).  By contrast, the ALJ discounted Dr. Adam's opinion in part because it did not provide "a full assessment of [Plaintiff's] abilities" and was not supported by the consultative examiner's testing. (R. 45).  Dr. Themistocle's records include his diagnosis and findings based on his examination and testing of Plaintiff, and those findings contradict Dr. Revan's findings in some respects.[10] (R. 15-30).  Thus, the new evidence is at the very least "potentially material,"

---

[9] Plaintiff saw Dr. Themistocle for pain management four times between November of 2015 and August of 2016, received a nerve block injection from him on February 9, 2016, (R. 15-30), and listed Dr. Themistocle on her disability forms as a physician she received treatment from, (R. 217, 257).  Thus, he qualifies as a treating source. *See* 20 C.F.R. §416.927 (a)(2) ("Treating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you…We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals…to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s)"); *see also Nunez v. Berryhill*, 16 Civ. 5078 (HBP), 2017 WL 3495213, at \*24 (S.D.N.Y. Aug. 11, 2017) (finding treating relationship where the doctor examined plaintiff three times over the course of three months, provided diagnoses, and prescribed medication).

[10] For example, the ALJ emphasizes Plaintiff's normal walking and gait in both her credibility determination and decision to assign Dr. Revan's opinion "great weight," but the additional records of Dr. Themistocle demonstrate that Plaintiff had an antalgic gait. (*Compare* R. 44-45 *with* R. 16, 19, 26, 29).  Further, whereas Dr. Themistocle noted during certain examinations that Plaintiff's cervical spine flexion and extension were limited and painful, and her lumbar spine rotation was limited, Dr. Revan provided that Plaintiff's cervical spine showed "full flexion [and]

and must be reviewed by the ALJ on remand. *See, e.g.*, *Lugo*, 2019 WL 4418649, at \*16 (remanding and directing Commissioner to consider new evidence that appeared "potentially material"); *See Lopez v. Comm'r of Soc. Sec.*, 17-CV-06241 (MKB), 2019 WL 1439538, at \*15–16 (E.D.N.Y. Mar. 30, 2019) (remanding and directing Commissioner to consider treating source statements that undercut some of the ALJ's conclusions, bolster part of plaintiff's testimony, and lend support to opinions assigned little weight); *Gurnett v. Berryhill*, 16-CV-955-FPG, 2018 WL 3853387, at \*4 (W.D.N.Y. Aug. 14, 2018) (remanding where it was "equally possible" that new evidence either clarified a pre-hearing disability or a more recent onset of a disability and noting that the Appeals Council's "cursory [and] formulaic rejection…without any legal or factual reasoning [was] insufficient"); *Garcia v. Comm'r of Soc. Sec.*, 208 F. Supp. 3d 547, 554–55 (S.D.N.Y. 2016) (remanding where the Appeals Council did not appropriately assess treating source records and where the ALJ relied "heavily on the opinion of a consultant").  In addition, these records also lend support to Plaintiff's subjective complaints concerning pain,[11] which the ALJ found inconsistent with the medical records, (R. 43-44), further suggesting that Dr. Themistocle's records could have influenced the ALJ's decision. *See McIntire v. Astrue*, 809 F. Supp. 2d 13, 22–23 (D. Conn. 2010) (remanding where a new opinion and radiological report

---

extension" and her lumbar spine lateral flexion and rotation were full. (*Compare* R. 16, 19, 26, 29 *with* 351). Additionally, Dr. Themistocle's records note that Plaintiff's Patrick test and Spurling sign were positive, (R. 16, 19, 26, 29), whereas Dr. Revan's records are silent with respect to these findings. (R. 349-52).

[11] Plaintiff testified that she had substantial back pain that prevented her from styling hair, which was not alleviated by physical therapy or injections. (R. 63-64, 68-70).  She described the pain as shooting from her lower back – and at times her head – down to her feet and sometimes fingertips and testified that it caused numbness. (*Id.*).  Plaintiff also testified that lifting more than a gallon of milk "puts a strain on [her] back," and she is not able to stand for more than 30 minutes at a time without sitting or lying down. (R. 71-74).  Dr. Themistocle's records similarly provide that Plaintiff experienced lower back pain that radiated to the lower extremities and caused intermittent numbness and tingling of the legs, (R. 15, 18, 25, 28), which Dr. Themistocles noted during the February 9, 2016 visit "affect[ed] her daily living," (R. 25).  While Dr. Themistocle's assessed Plaintiff's subjective pain as somewhat controlled by medication, he repeatedly opined that her functioning (i.e. walking and standing), was painful and limited. (R. 15, 18, 25, 28).

"tend to make [plaintiff's] subjective complaints regarding pain…more credible").  Thus, remand is warranted for the ALJ to consider Dr. Themistocle's records.

### E.  The Parties' Remaining Arguments

Plaintiff argues that the ALJ erred by failing to consider the side effects of Plaintiff's medications. (Docket No. 16 at 19-21).  The Commissioner also argues that substantial evidence supported both the RFC and credibility determinations. (Docket No. 18 at 20-29).  However, due to errors discussed herein, the Court cannot determine whether the ALJ's decision is supported by substantial evidence. *See Barrie on behalf of F.T. v. Berryhill*, 16 Civ. 5150 (CS)(JCM), 2017 WL 2560013, at *11 (S.D.N.Y. June 12, 2017) (declining to address the Commissioner's argument that the decision was supported by substantial evidence where the ALJ failed to develop the record); *Wallace v. Berryhill*, 14 CV 2066 (NSR)(LMS), 2017 WL 9534743, at *14 (S.D.N.Y. Aug. 14, 2017) (legal errors in the ALJ's decision such as failing to follow the treating physician rule "preclude the [Court] from determining whether the ALJ's decision is supported by substantial evidence"), *report and recommendation adopted*, 2017 WL 4011494 (S.D.N.Y. Sept. 11, 2017); *see also Wagner v. Comm'r of Soc. Sec.*, 1:18-CV-0121 EAW, 2020 WL 500177, at *5 (W.D.N.Y. Jan. 23, 2020) (declining to rule on plaintiff's additional arguments where the court remanded for further consideration of a treating physician's opinion) (collecting cases).

### III.  CONCLUSION

For the foregoing reasons, Plaintiff's motion is granted, the Commissioner's cross-motion is denied, and the case is remanded for further proceedings consistent with this opinion.

The Clerk is respectfully requested to terminate the pending motions, (Docket Nos. 15, 17), and close the case.

Dated:    May 1, 2020
          White Plains, New York

                              **SO ORDERED:**


                              _____
                              JUDITH C. McCARTHY
                              United States Magistrate Judge